# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON MARTINEZ VARGAS,<br><br>                    Petitioner,<br><br>      v.<br><br>CHERYL PLILER,<br><br>                    Respondent. | 1:03-cv—06622-OWW-SMS-HC<br><br>FINDINGS AND RECOMMENDATIONS TO DENY THE FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (Doc. 22)<br><br>FINDINGS AND RECOMMENDATIONS TO ENTER JUDGMENT FOR RESPONDENT AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding with counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C.§ 636(b)(1) and Local Rules 302 and 304. Pending before the Court is Petitioner's claim that his Sixth and Fourteenth Amendment rights were violated when his trial counsel allegedly slept through substantial portions of the trial proceedings.

## I.  Background

### A.  Procedural Summary

Petitioner was convicted in Kern County Superior Court of four counts of second degree robbery (Cal. Pen. Code § 212.5(c)).

(CT 243.)  The jury also found true enhancements based on personal use of a firearm in the commission of robbery (Cal. Pen. Code § 12022.53) and commission of an offense in association with a criminal street gang (Cal. Pen. Code § 186.22).[1]  The jury trial occurred from January 17, 2001, through January 22, 2001 (RT 62-563); thereafter, allegations concerning enhancement of sentence pursuant to Cal. Pen. Code § 12022.1 were tried to the Court and found not proven (RT 564-75).  On October 23, 2001, Petitioner was ultimately sentenced to a term of twenty-nine (29) years and four (4) months in prison.  (Supp. CT 22.)

Petitioner filed a direct appeal with the California Court of Appeal for the Fifth Appellate District (DCA), which affirmed the judgment.  Petitioner filed a petition for review with the California Supreme Court, which the court denied without a statement of reasoning or authority.

On April 15, 2003, Petitioner filed a petition for writ of habeas corpus with the Kern County Superior Court.  The court denied the petition on May 14, 2003, on the merits and with a citation to In re Swain, 34 Cal.2d 300, 303-304 (1949), and In re Duvall, 9 Cal.4th 464, 474 (1995).  The court reasoned that Petitioner had failed to state with particularity the facts on which relief was sought and had failed to provide reasonably available documentary evidence demonstrating that, as a

---

[1]Cal. Pen. Code § 186.22 provided for a ten-year enhancement of sentence for the commission of a violent offense such as robbery for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members.  Cal. Stats. 1997, c. 500, § 2, amended by Initiative Measure, Prop. 21, § 4, approved March 7, 2000.  A criminal street gang was defined as any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of specified criminal acts, having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.  § 186.22(f).

demonstrable reality, there was a reasonable probability that but for allegedly ineffective assistance of trial counsel, the results of the case would have been more favorable. (Ans., Ex. K, 2.)  The court stated:

> Petitioner has failed to state sufficient facts to show that his trial counsel (sic) his counsel's falling asleep prejudiced his case.  Petitioner failed to submit any facts and/or documentary evidence as to the specific number of times that counsel fell asleep, during what portions of the trial he fell asleep, how long he was asleep, or how specifically counsel's falling asleep affected defense of Petitioner's case.  Petitioner, therefore, failed to show as a demonstrable reality that had counsel not fallen asleep the trial would have proceeded differently and that Petitioner would have received a better result.  While Petitioner makes a specific reference in the trial transcript to one instance where counsel allegedly fell asleep, Petitioner fails to attach a copy of that portion of the transcript, so the Court cannot make any determination as to the circumstances surrounding this particular instance.  As Petitioner failed to show he was prejudiced by his trial counsel's falling asleep to make this Motion, Petitioner has failed to make a prima facie case for relief.

(Ans., Ex. K, 2.)

On June 16, 2003, Petitioner filed a second petition for writ of habeas corpus with the Kern County Superior Court. Petitioner alleged that during the trial, his counsel slept through portions of the prosecutor's examination of adverse witness Frank Gonzales' testimony; had to be jarred awake by Petitioner in order to object to the prosecutor's solicitation of testimony Petitioner considered irrelevant (with counsel objecting in coming awake and acknowledging that he had been asleep and had missed the question and answer posed by the prosecutor (citing RT 281: 23-24); and thereby slept through substantial and significant portions of the proceedings and denied Petitioner his right to representation by counsel during

1   every critical stage of the proceedings.  (Ans. Ex. L, 4.)  The

2   court denied the petition because Petitioner had failed to state

3   a prima facie case for relief; the court also denied the petition

4   because it was successive, citing In re Clark, 5 Cal.4th 750, 768

5   (1993).  (Ans., Ex. M.)

6       On August 4, 2003, Petitioner filed a petition for writ of

7   habeas corpus in the DCA, raising the issue of counsel's

8   ineffective assistance based on sleeping and relying on

9   essentially the same facts as in the previous habeas petitions

10   filed in the trial court.  (Ans. Ex. N, 4.)  Petitioner declared

11   under penalty of perjury that he personally observed the conduct

12   during trial.  (Id., verification.)  Petitioner relied on page

13   281 of the reporter's transcript, in which the prosecutor asked

14   Gonzales, a gang expert, if it would be significant to him if he

15   heard from Mario Bravo's mother that Bravo had grown up in the

16   Okie neighborhood and had long known Jason Vargas and Lee

17   Estrada; Petitioner's counsel objected, stated that he did not

18   think they had heard that testimony, and stated, "I may have been

19   asleep."  The trial court sustained the specifics of the question

20   and asked that it be rephrased.  (Ans., Ex. N, Ex. A.)  The DCA

21   summarily denied the petition without a statement of reasoning or

22   authority on August 28, 2003.  (Ex. O.)

23       On September 23, 2003, Petitioner filed a similar petition

24   for writ of habeas corpus in the California Supreme Court.  The

25   court denied the petition without a statement of reasoning or

26   authority on June 30, 2004.  (Ans., Exs. P, Q.)

27       Petitioner filed the original petition in this proceeding on

28   November 12, 2003.  On November 22, 2004, a first amended

petition (FAP) was filed in which Petitioner alleged that his trial counsel was ineffective because of numerous perceived inadequacies in his representation of Petitioner before and during the jury trial.  (Doc. 22, 6A-6D.)  Respondent answered the FAP on February 18, 2005 (doc. 26); Petitioner filed a traverse on April 13, 2005 (doc. 33).  On September 26, 2006, this Court denied Petitioner's FAP.  (Docs. 52, 54.)

On an appeal taken by Petitioner, the Court of Appeals for the Ninth Circuit affirmed the denial of the FAP except with respect to the issue of the alleged ineffective assistance of trial counsel based on counsel's sleeping through a substantial portion of the trial proceedings:

> Vargas argues that he was denied the effective assistance of counsel, in violation of the Sixth Amendment, as a result of his trial counsel's sleeping during a substantial portion of the trial. Vargas alleges facts that, if true, may amount to a violation of his right to the effective assistance of counsel.  See Strickland v. Washington, 466 U.S. 668, 680-96 (1984); United State v. Cronic, 466 U.S. 648, 659-60 (1984).  Respondent Pliler asks us to assume that counsel was asleep--for how long or through what portion of the trial we do not know-- but to conclude nevertheless that Vargas suffered no prejudice.  Such a assumption would force us to engage in a series of speculations to answer a serious question about an important constitutional right.  We conclude that Vargas's claim cannot be resolved by reference to the state court record in this case.  See Schriro v. Landrigan, 550 U.S. 465, 474 (2007).  Nor should it be resolved in the manner the state proposes.  We, therefore, remand to the district court to conduct an evidentiary hearing.

(Doc. 69, 2.)  The mandate of the Court of Appeals was filed in this Court on July 20, 2009.

### B.  Factual Summary

#### 1.  General Transactional Facts

In the previous findings and recommendations (doc. 52, 2:14-

5

15), this Court found that the DCA correctly summarized the facts
in its appellate opinion, and it adopted the factual recitations
set forth by the DCA in its brief summary of the evidence, which
was as follows:

> Vargas and three or four of his friends, all members
> of the Okie Baker criminal street gang, went swimming
> in the Kern River.  The victims, Michael, Rudolpho,
> Julio, and Jose, parked about 50 yards from Vargas's group.
> The Vargas group drove up to the victims and jumped out
> of their car.  Vargas immediately displayed a gun and
> told the victims not to resist, or he would "buck"
> (i.e., shoot) them.  Vargas watched his friends
> assault the victims and steal numerous items of
> nominal value, including the keys to Michael's car.
> Comments were made about the Okie Bakers' superiority
> to people from the victims' hometown.  The perpetrators
> escaped in their car.
>
> Unfortunately for Vargas, one of the victims spent time
> in juvenile hall with one of the perpetrators.  The
> sheriff's department was called and the perpetrators
> were quickly identified.  Vargas eluded arrest for
> approximately two months.

(Answer to FAP, Ex. G, Op. of DCA, 2.)

### 2.   Trial Court Proceedings

#### a.   Evidentiary Background

On the stand, victim Jose Rosas identified Petitioner as a
perpetrator who had displayed a gun to everyone present at the
scene of the crime and had said he was going to "buck" the group
of victims; further, Petitioner had hit Michael Kent.  (RT 79-84,
90, 110.)  Rosas also identified Petitioner in a photographic
line-up and testified that Petitioner had been introduced as
"Chango."  (RT 90-91, 93, 99.)  Further, the perpetrators of the
robbery had said they were from "Okie," but Rosas did not know if
it was a gang or not.  (RT 115.)

Victim Michael Kent identified the four perpetrators as
including Lee Estrada; Mario Bravo; and Petitioner, who had a

6

Case 1:03-cv-06622-OWW-SMS   Document 104   Filed 03/29/11   Page 7 of 44

revolver in his waistband and took it out and waved it around;
another person wore an "Okie" hat and was introduced as "Chango."
One of them had identified his group as "Okie Bakers" and talked
"trash" about people from Wasco, and Petitioner had hit Kent.
(RT 116, 118, 120, 123-24, 126-31, 134-35, 137-39.)   Kent
identified Petitioner and Bravo in a photographic line-up.  (RT
131-34.)   Kent saw that one of the men bore a tattoo that looked
like a necklace hanging down. (RT 134-35.)

Victim Julio Gallardo testified that one of the perpetrators
had a nickname or street name of "Chango," and it was not
Petitioner who had the tattoo and wore the Okie hat. (RT 156,
161-62, 167-68.)   Gallardo also identified Petitioner as the
person with the gun who had instructed the victims not to hit his
friends back or he would "buck" them; Petitioner also took the
keys that operated the victims' vehicle, and Petitioner might
have been the one introduced as "Chango."   (RT 169-72, 176-77,
183, 186, 196-98.)

Petitioner's mother, Mary Castro Vargas, testified that
Mario Bravo grew up with her son in the Cottonwood or "Okie"
neighborhood; Petitioner was known by the nickname "Jay Dogg,"
but she had not heard him referred to by that name, and she had
never heard anyone call him "Chango."  (RT 202, 204-05, 208-09.)
Petitioner's counsel objected to the admission of hearsay
testimony concerning what Mario Bravo's mother had told
Petitioner's mother concerning their plan to go to the lake on
August 15, 2000, the day of the offenses.  (RT 203, 207-08.)

Mario Bravo's mother, Delia Cisneros, testified that Mario
Bravo had left her house mid-day in her car bound for the Kern

7

River and Hart Park, the scene of the offenses; her car matched witnesses' description of the car carrying the perpetrators. (RT 209-12.) Cisneros testified that her son and Petitioner had grown up together for four or five years, and her son had known Lee Estrada for seventeen years. (RT 213-14.)

Petitioner's counsel objected to hearsay concerning Mario Bravo's statement regarding his intention to go to Hart Park and regarding Petitioner's mother's conversation with Cisneros on the day in question. (RT 212, 214-215.) He also objected on hearsay grounds to statements made by the victims to an investigating officer. (RT 224.) An investigating officer testified that Kent had stated the perpetrator who wielded the gun had a tattoo on his neck. (RT 226-27.) Petitioner's counsel objected to other evidence offered by investigators. (RT 253 [lack of personal knowledge].) Counsel cross-examined the investigators and established that neither Gallardo nor Kent had been positive of their identifications of the person with the gun. (RT 241-42, 254.)

b.   Testimony of Frank Gonzales

Frank Gonzales was the ninth of twelve witnesses for the prosecution. (RT 256-305.)

Bakersfield Police Officer Frank Gonzales testified that he had formalized training through official state bodies and unofficial law enforcement associations to prepare for specialization in gang crimes; his training had covered Hispanic turf gangs, their use of weapons, their mode of narcotics use and sales, subjects of importance to the gangs, how to identify gang members, and gang rivalries. He had spoken with many types of

8

law enforcement officers and had five and one-half years of experience as a law enforcement officer and two and one-half years of experience on the street enforcement unit, which focused on gang crime and performed a highly visible patrol in known gang areas.

In the course of his work, Gonzales identified gang members and gathered intelligence on the interrelationships of local Bakersfield gangs. (RT 255-58.) He had met about three hundred (300) to five hundred (500) gang members and had discussed their membership, turfs, rivalries, graffiti, and tattoos; further, Hispanic turf gangs were tied with a prison gang that called the shots from prison on to the street, and local rivalries disappeared when gang members were in prison, where Hispanics all became allied. (RT 259-62.) There were two groups of Hispanic turf gangs: the northerns or Nuestra Familia, from Delano and northward, and the "Sureno" or southern gang, from south of Delano. (RT 262.) Northerners had "14" tattooed on them, and Southerners had "Sur" or "Sur 13" tattooed on them. (RT 263-64.)

Gonzales had learned from talking to experts and ten (10) to fifteen (15) members of the gang that the "Okie" or "Okie Baker" Gang was one of the five largest turf gangs in Bakersfield; its territory was the county or unincorporated part of Bakersfield, and membership was mostly determined by school attendance or growing up in the area. (RT 264-66.) The primary activities of the Okie Bakers were murder, assault with a deadly weapon, possession of firearms, burglary, possession of narcotics for sale, carjacking, and witness intimidation; they would also commit robberies. (RT 272-73.) Gonzales knew of fatal shootings

sparked by gang rivalries.  (RT 267-72.)  Gang membership carried

an expectation that members would commit crimes as desired by

other gang members and would not cooperate with the police if

apprehended.  (RT 278.)  It was possible to terminate gang

membership by death, incarceration, or total dissociation from

the gang and gang turf.  (RT 276-77.)

Factors considered in identifying active gang membership

included admitting gang affiliation, identification by reliable

sources or rival gang members, gang tattoos, the frequency of

contacts with a person in gang territory, field interview cards

reflecting gang indicia and probation or parole status,

associates, clothing reflecting gang indicia, and past criminal

activities.  Younger gang members might admit membership

outright, but previously incarcerated gang members might deny

membership or give addresses outside of gang turf because of

knowledge of increased penalties for criminal activities in

furtherance of gangs.  (RT 273-76.)

Gonzales opined that on August 15, 2000, there were more

than three members of the Okie Bakers; based on documented

admissions, associations, prior apprehensions for criminal

activity in May and August 2000 in Okie territory and in the

presence of other gang members, and the robberies in question,

Gonzales opined that Lee Estrada was an Okie member.  (RT 273,

278-80, 289.)  Gonzales found significant with respect to Mario

Bravo's gang membership the use of a firearm in both the robbery

in question and in others reported by the sheriff, and Bravo's

active, physical striking the victims.  Further, two of the co-

participants (Estrada and Petitioner) were identified gang

members.  (RT 280-81.)

When Gonzales was asked if it would be significant to him if he heard from Bravo's mother that Mario Bravo had grown up in the Okie neighborhood and had long known Petitioner and Estrada, Petitioner's counsel stated:

Objection.  I don't think we've heard that testimony. I may have been asleep.

(RT 281.)  The court sustained the objections with respect to the "specifics of that question."  The prosecutor then rephrased the question to ask if it would be significant to Gonzales if he learned that Mario Bravo grew up in the Okie neighborhood with Petitioner and Lee Estrada; Gonzales answered, "Yes."  (RT 281.)

With respect to Petitioner's gang membership, Gonzales found significant his having contacted Petitioner at least once within the gang turf and Gonzales's having observed gang tattoos on him in the late spring or early summer of 2000.  (RT 281-82.) Gonzales also testified that he had found gang-related tattoos on Petitioner's upper arm and neck, and he had reviewed photographs and associated field interview cards concerning Petitioner, including one dated March 26, 2000, that documented Petitioner's tattoos, monikers of "Jay Dogg" and "Mr. Chango," and his admission of being a member of the Okie Baker Gang at the time. (RT 284-88.)  Based on those factors, and on Lee Estrada's membership in the gang, Gonzales opined that on August 15, 2000, Petitioner was a member of the Okie Baker Gang.  (RT 288.)

When the prosecutor asked Gonzales if he had read police reports mentioning Petitioner and if any of them was significant to him, Petitioner's counsel objected "[u]nder 801" unless the

11

reports were deemed reliable.  (RT 282.)  The Court permitted the
witness to respond, and when Gonzales answered, "Yes," the
prosecutor asked how many he had reviewed and why they were
significant.  Petitioner's counsel objected to the evidence
unless the reports were deemed reliable information under 801,
and the court sustained the objection.  (RT 283.)  With two more
questions the prosecutor attempted to elicit what information in
the reports was significant to Gonzales in giving an opinion as
to gang membership, but Petitioner's counsel continued to object
on the basis that there was a lack of foundation as to what
Gonzales considered significant.  (RT 283-84.)  When the
prosecutor asked to approach the side bar and to direct the court
to case law, the court sustained defense counsel's objection and
asked the prosecutor to move on, noting that there had been
several days for the prosecutor to do that, but he had not done
it.  (RT 284.)

   Gonzales also opined that on August 15, 2000, Lee Estrada
was an active member of the Okie Baker Gang.  (RT 288.)  Further,
one unidentified person who had been in the car with Petitioner
was also considered to have been a gang member because he wore a
hat that said "Okie" on it.  (Rt 289.)  The other unidentified
person was also a gang member because gangs did not let
unaffiliated persons participate in crimes due to a lack of trust
and loyalty.  (RT 290.)

   Gonzales further opined that the robberies were committed
with the intent of furthering the Okie Gang and its reputation
because the crime was committed with numerous Okie affiliates,
the multiple victims were from out of town, the firearm was used

to instill fear, and all the circumstances combined to result in notoriety, respect, and fear towards the gang from rival gang members.  Further, the Okie Gang respected commission of such crimes, and the location of the crime outside of the gang turf simply reflected the opportunistic nature of the transaction. (RT 290-91.)

Petitioner's counsel continued to make objections during the examination of Gonzales (RT 291), and he cross-examined Gonzales concerning the information on the field interview cards, the characteristics of the Okie Baker Gang and of street gangs in general, the modus operandi of sharing of the proceeds of gang thefts, the independence of various gang members in committing offenses, the source of Gonzales's information, the gang characteristics or membership of the victims, and the process of dissociation from a gang.  (RT 292-302.)

Defense counsel stipulated to Petitioner's having Okie Bakers tattoos, opposed introduction of parts of photographic evidence for which there was no foundation, and expressed concern that inadmissible photographic evidence not be inadvertently shown to the jury.  (RT 313, 316, 321.)

At the conclusion of the prosecution's case, defense counsel answered that he was ready to proceed with the defense case and waived opening statements.  (RT 317, 319.)  He presented Lee Estrada, a minor with whom his investigator had spoken but with whom counsel had not spoken, as a defense witness.  Estrada testified to going to the lake and having known Petitioner and Bravo since early childhood.  (RT 318, 322-23.)  He testified that on the day of the robberies, Petitioner smoked more than

enough PCP not to know what he was doing; further, neither
Petitioner nor anyone else in his group had a gun except for
Estrada himself, who was drunk and had an unloaded gun with an
inoperable trigger; Estrada showed the gun to the Wasco group
while Petitioner was at the car unable to stand because of
intoxication, and Estrada took some food; then the group left.
(RT 324-34.)  Petitioner was known as "Jay Dogg," but Estrada had
never heard anyone call him "Chango" or "Mr. Chango."

On cross-examination, Estrada admitted having lied to law
enforcement officers who had arrested him and questioned him
about the offense; he had denied having been present or having
seen a gun on anyone, and he admitted having told an officer that
either Mario Bravo or Petitioner had the gun.  (RT 340-43.)
Further, he had not told officers that Petitioner was "wasted" on
PCP.  (RT 346-47.)  He testified that he had stolen food, car
keys, and clothing from the Wasco group and had been a gang
member for about a year based on having grown up in the area.
(RT 343-46, 349.)

Defense counsel objected occasionally during cross-
examination of Estrada. (RT 342, 344.)  On redirect, defense
counsel clarified that Estrada had not been asked by officers if
Petitioner had been on PCP, and Estrada's failure to admit that
he himself had the gun was because of fear.  (RT 351-52.)

Defense counsel also called Mario Bravo, who testified he
had grown up with Petitioner and Estrada.  (RT 355.)  Bravo
testified that his group was about forty yards from the Wasco
group until they were leaving, when Bravo punched Lopez because
they were looking at him wrong and saying things.  Petitioner did

14

not have a gun, and his nickname was "Jay Dogg," but Bravo had never heard him called "Chango," or "Mr. Chango." (RT 361-64.) On cross-examination, Bravo denied knowing if Petitioner had a gun, and he testified that Petitioner did not hit anyone or do any drugs that day; he was completely sober. (RT 367-69.) Bravo denied that he or Estrada was a gang member or that he had known or said that Petitioner was an Okie. (RT 371-72.)

Defense counsel made one objection during cross-examination of Bravo. (RT 376.)

Defense investigator Joe Serrano testified for the defense that during an interview, Julio Gallardo of Wasco had stated to him that the person with the gun was called "Chango," or Mario Bravo. (RT 377-79.) On cross-examination he testified that when he interviewed Estrada, Estrada had said nothing concerning Petitioner's having smoked PCP or having been "catatonic on drugs or alcohol," and Estrada explained that he had never really told an officer that Petitioner was probably the one with the gun. (RT 383-84.) Defense counsel clarified on direct that Serrano had not asked Estrada about Petitioner's sobriety. (RT 384.)

Defense counsel told the trial judge that his last witness would be Petitioner after he was informed of his rights again. (RT 385.) Counsel requested some special instructions and objected to some of the prosecutor's instructions. (RT 395-99.)

Petitioner testified that his nickname was "Jay Dogg," but he had never been known as, and never told an officer that he had been known as, "Chango," which meant "monkey." (RT 403, 409.) He had been at the lake but never met and was never introduced to any of the Wasco group; he had been high on PCP and remembered

15

only a little of that day, but he had not had or exhibited a gun. He did not recall hitting anyone, and he did not help anyone rob the people from Wasco. He remembered getting out of the car but he did not know why, and it was not to back up his fellow gang members. (RT 404-06, 412-13, 417.) Afterwards he went to Lee Estrada's house, drank a few bears, and then went to the home of Greg Mendoza to help him take care of his children. Petitioner stayed there for two months. (RT 419-20.) He testified that he did not know sheriff's officers were looking for him, but he admitted that when found, he was hiding. (RT 420.)

Petitioner described the gang as a barbecue club of a bunch of home boys "kicking it," and it was about trust, but it was not about violence. (RT 413-14.) He admitted that the Okies had deadly enemies and that he had several Okie tattoos, including one that said "Okie Makes the World Go Round," which had signified dedication to the neighborhood, but it no longer meant anything to him. (RT 414-15.)

On cross-examination, Petitioner admitted having joined the Okie Bakers in the eighth grade, but he was no longer a member at the time of the robberies; he did not recall when he decided to leave the gang but did so in order to become a father and believed it was between March and May 2000, before his daughter's birth on September 19, 2000. (RT 407-08, 417.) He did not recall whether or not he told officers he was a gang member in March 2000 or had nicknames that included "Chango." (RT 408-10.) He continued to associate with gang members until his arrest, and he admitted having been arrested on July 8, 2000, for having "ditched" a knife in the heart of Okie territory. (RT 411.)

On redirect, Petitioner testified that he got the tattoos between the ages of thirteen (13) and seventeen (17) but did not see the need to take them off.  (RT 421.)

The prosecution's rebuttal witnesses included Bakersfield Police Officer Clayton Madden, who testified that on July 9, 2000, on an occasion when Petitioner was taken into custody, Petitioner stated he was an Okie member whose name was "Jay Dogg," and he had been "jumped in" to the gang for four years. (RT 422-25.)  On cross-examination, Petitioner's counsel established that Petitioner did not state that his nickname was "Chango." (RT 425.)

Another rebuttal witness, Bakersfield Police Officer Claudia Payne, testified that when in March 2000 she came into contact with Petitioner, who was a passenger in a car stopped in connection with a traffic violation, she and her partner photographed Petitioner and made a field interview card documenting the nicknames he reported, which included "Jay Dogg" and "Mr. Chango."  Petitioner told her that "Jay" referred to "Jason," and "Mr. Chango" was what he was called when he was younger.  He also admitted that he was a gang member.

On cross-examination, Petitioner's counsel brought out the fact that Payne had not listed the "Chango" moniker on the field interview card.  (RT 427-32.)

Deputy Sheriff Smallwood was recalled and testified on rebuttal that when he had come into contact with Lee Estrada on August 15, 2000, he had not coerced him or his statements and had not told him that he knew that Petitioner had the gun; Estrada spoke with him willingly.  When informed he was being arrested,

17

Estrada initially told him that Mario or Jason (Petitioner) would have had the gun because they were older, but then he said that Petitioner was probably the one with the gun and that he had run up and got in the victim's face.  Estrada did not mention that Petitioner had been smoking PCP or was intoxicated; Estrada did not say that he himself was the one with the gun.  (RT 433-37.)

During direct examination of Smallwood, Petitioner's counsel objected to the scope of a question posed to Smallwood and made numerous hearsay objections that were sustained.  (RT 433, 435-36.)  On redirect, Petitioner's counsel established that Estrada told Smallwood that he did not see a gun and that Smallwood had not inquired into the state of Petitioner's sobriety.  (RT 437-38.)

Deputy Melanson was recalled and testified on rebuttal that when he contacted Mario Bravo on August 15, 2000, at Bravo's residence, he asked Bravo if Petitioner was a member of the Okie Gang, and Bravo told Melanson that Petitioner "claim[edl] Okie." Bravo also admitted that Bravo had taken a bucket of beer from the guys from Wasco.  (RT 438-49.)  On cross-examination by Petitioner's counsel, Melanson testified that Bravo had told him that Petitioner's moniker was "Jay Dogg."  Further, when first asked, Bravo said no one had a gun, and Bravo did not name Petitioner as having taken anything.  (RT 439-40.)

Deputy Sheriff William Thomas Little, Jr., testified as a rebuttal witness.  Officer Little first became acquainted with Petitioner on August 13, 2000, in a residence near Cottonwood that bore indicia of gang membership, including several rosters of members of the Okie Bakers Gang.  The contact followed a call

regarding brandishing a firearm.  (RT 440-44.)  When the deputy learned that Petitioner was wanted two days later, he made repeated efforts to locate Petitioner at his residence, his girlfriend's house, and another address; he informed his mother and girlfriend that he was looking for him.  The officer found Petitioner on October 13, 2000, hiding under a bed in the back bedroom of a house in Bakersfield.  (RT 443-44.)

During the examination of Officer Little, Petitioner's counsel lodged an objection, and on cross-examination, counsel established that the officer did not believe that Petitioner was residing in the house with the gang roster written on the wall. (RT 445.)

At the conclusion of the testimony, the Court ordered the afternoon recess and stated that the court intended to "try to get started as close to 3:19 and a half" as possible.  (RT 446.) There was a short colloquy concerning abstracts that constituted documentary evidence of two gang shootings that were the subject of Officer Gonzales's testimony.  In that discussion, Petitioner's counsel demonstrated a memory of the pertinent portion of Gonzales's testimony that surpassed that of both the prosecutor and the trial judge.  (RT 447-48.)  Counsel then explained to the court that he had to run off and do something else and then come back to argue the case; he had been put in the position of having to argue late on a Friday afternoon before with disastrous results, and he requested to argue the case on Monday.  A short colloquy followed:

> MR. QUICK [defense counsel]:  That is what
> I'm saying.  I'm very fatigued at the end
> of the week, and I do not feel prepared to start

to argue this afternoon.  If I have to, I will.  But
I really--and I had this other case, and I can't remember
the name of it, and it was disaster, and the same thing
happened and I got sent out to take care of, take care
of a readiness.

THE COURT:  You're not going to leave this courtroom.
I don't know-

MR. QUICK:  Oh, okay.  I'm talking about--I've been
ordered to Department 4.

THE COURT:  Well, Department 4 probably will be
here at 4:30.

MR. QUICK:  Okay.

THE COURT:  That's not a problem as far as I'm concerned.

MR. Quick:  I thought I was supposed to go there at the
break.

THE COURT:  I'm ordering you to stay here.

MR. QUICK:  Maybe we could get that case sent over here and
take the plea.

THE COURT:  Take one thing at a time.  Don't get your hopes
too high on that.

As far as you're here to prepare for any closing statement
you might need to address here.  You may not.  I don't know
how long Mr. Hamilton is going to go.  He may take the rest
of the afternoon.

MR. HAMILTON:  Can I?

THE COURT:  I don't care.  We're going forward on this
case.  Nobody else has any priority over this courtroom,
period.  No if's, but's about it.  Put out the signals
everybody stays place (sic) in this courtroom until they
are relieved of their responsibilities.

(RT 449.)

     After a brief recess, closing arguments commenced.  (RT 449-

50.)  The prosecutor argued that the robbery was a gang

phenomenon and that the gang members had lied to "help their home

boy, Jason Vargas...."  (RT 451.)  The prosecutor reviewed all

the evidence and the charged offenses and enhancements, and he

requested that the jury return with a guilty finding as to robberies and true findings as to the enhancements involving gun use and furtherance of gang activity.  (RT 450-78.)

When the prosecutor had completed his argument, Petitioner's counsel stated:

> Yes, I really would like to put off my argument
> until Monday if I could.

(RT 478.)  The court stated that it was unknown how long argument was going to be and that it was appropriate for defense counsel to go ahead and get started at that point.  (RT 478.)

Defense counsel then began his closing argument.  (RT 478-86.)  He suggested that there was no gun or alternatively that if there was a gun, Estrada had it.  (RT 479-80.)  Counsel suggested that the victims might have falsely claimed that Petitioner had a gun in order to save face over having submitted to Petitioner's group.  (RT 478-79, 492.)  He pointed out an inconsistency between Gonzales's testimony that he had not heard of gang rosters being on walls, and Officer Little's testimony that he saw such a roster at an Okie Baker residence.  (RT 479-80.)  He attacked the foundation of Gonzales's opinions, and he argued the concept of reasonable doubt.  (RT 480-82.)  He argued the inconsistency of the photographic evidence of tattoos and victim Kent's testimony concerning what tattoos were observed; he questioned the gang membership status of the victims.  (RT 482-84.)  Petitioner's counsel's closing argument was then interrupted for the weekend break.  (RT 485-86.)

At a conference the following Monday morning held outside the jury's presence, Petitioner's counsel requested an

instruction on voluntary intoxication, the specific intent
involved in robbery, the lesser included offense of petty theft,
the gang enhancement, and eyewitness identifications.  (RT 487-
89.)

Petitioner's counsel completed closing argument, discussing
mental state and specific intent, and describing the order in
which the issues on the verdict forms were to be addressed.  He
argued that the jury could consider Petitioner's intoxication in
determining whether he had the specific intent for robbery.  (RT
491-93.)

The prosecutor completed his final closing argument,
discussing each potential argument or defense, including the
presence of a gun, reasonable doubt, the irrelevance of victim
Lopez's gang membership to Petitioner's guilt, the totality of
the evidence that Petitioner and his co-participants were gang
members, the identity of the person who wielded the gun,
Petitioner's state of mind and intoxication, weighing
discrepancies in witnesses' testimony, discerning what lies were
told on the stand, and the need for unanimity in the theory of
guilt.  (RT 493-509.)

During the jury's deliberations, defense counsel anticipated
a problem concerning the logistics of obtaining an alternate
juror for the second, post-verdict stage of the bifurcated
proceedings that would pertain to additional enhancements
relating to Petitioner's status of being on bail when the
offenses occurred; Petitioner ultimately waived a jury for the
bifurcated proceedings, and the court found the additional
enhancements not true.  (RT 539-52, 567-75.)

3.   <u>Evidence Introduced at the Evidentiary Hearing</u>

On October 14, 2010, an evidentiary hearing was held before the undersigned Magistrate Judge at which Petitioner appeared with his counsel, Carolyn D. Phillips, and Respondent was represented by Paul E. O'Connor of the Office of the Attorney General of the State of California.

Petitioner testified that he was present during the entire trial seated at the left side of his trial counsel, George Wright Quick.  During the testimony of Officer Frank Gonzales, Petitioner noticed Quick's eyes were closed, and he observed Quick's head back and mouth slightly open, and Petitioner could tell that Quick was asleep.  (RTEH 16-19.[2])  Petitioner immediately nudged Quick, who then stated that he objected and made a statement regarding his having been asleep.  Petitioner did not observe Quick's eyes closed during any other point in the trial.  (<u>Id.</u> at 17.)

On cross-examination, Petitioner testified that although he had voiced many complaints about his trial counsel and had made several motions to relieve his appointed counsel, he did not complain to the trial judge when he observed Quick asleep because he did not know it was "a violation of the jury trial."  (RTEH 18:11-18.)

George Wright Quick testified that he had been an attorney since 1971, and he recalled representing Petitioner at the trial held in 2001 pursuant to the court's appointment.  (RTEH 20-21.)

---

[2] Case references are to the internal page numbers in the transcript of the evidentiary hearing as distinct from the page numbers assigned by the Court in document 93, the document containing the transcript that was filed in this Court.

Although before Petitioner's trial Quick had participated in about forty (40) to fifty (50) trials as defense counsel, he had never fallen asleep at trial and had never been disciplined by the State Bar of California. (Id. at 21, 28, 34.)  He had reviewed the trial transcripts before testifying. (Id. at 21, 29, 34.)

Quick was fatigued at the end of the week of trial and sought to postpone his closing argument until Monday so he could gather his thoughts and try to make a coherent presentation.  He had not had any surgery, tooth extractions, or dental work other than going to the hygienist during the week of the trial.  He did not recall having difficulty sleeping and took no sleep aids or medication to deal with stress or anxiety.  (Id. at 22-25.)

Quick recalled that during the testimony of gang expert Gonzales, he objected and said, "I don't think we've heard that testimony; I may have been asleep." (RTEH 27, 31.)  However, Quick had not been asleep; rather, he was being sarcastic and was joking.  He objected because the words used in the question were not the words that had been presented to the jury. (Id. at 28-29.)

Quick delivered his closing argument over the course of two court days, a Friday and a Monday, and he was tired on Friday. (Id. at 30.)  He asked not to be sent out to another courtroom to take care of another matter during the trial because he had a problem of not being able to switch gears from one proceeding to another proceeding; at least he did not have that problem in Petitioner's case. (Id. at 31.)  Although he would have preferred to have begun his closing on Monday because he was very

24

1   fatigued, including being mentally fatigued, Quick gave a portion
2   of argument on Friday and believed it was a competent closing
3   argument, although it was not the argument he would liked to have
4   made if he had been given the weekend to prepare.  (Id. at 32-
5   33.)  Quick gave the remainder of the argument on Monday, when he
6   was not tired.  (Id. at 32.)  He believed that the comment
7   concerning his having fallen asleep occurred probably the day
8   before he began argument.  (Id. at 35-36.)

9       Petitioner requested that the Court take judicial notice of
10  portions of the reporter's transcript of trial (vol. 1, p. 281
11  [counsel's objection and comment concerning having been asleep],
12  and vol. II, pp. 448 [pre-argument statement concerning being
13  very fatigued and not feeling prepared to start to argue that
14  afternoon] and 478 [pre-argument statement that he would really
15  like to put off argument until Monday]).  (Id. at 36-37.)

16      Respondent presented the testimony of the trial judge, the
17  Honorable Clarence Westra, who had reviewed the trial transcript.
18  (RTEH 38-39.)  During the trial, Westra observed Quick, who was
19  in the judge's line of sight, as Gonzales testified, and Westra
20  did not observe Quick asleep during any portion of Gonzales's
21  testimony.  (Id. 40-41.)  Westra did not recall any specific
22  point at which he looked at Quick, but he recalled looking at
23  Quick and at his location at counsel's table, although he was not
24  looking at Quick the entire time that Gonzales was testifying.
25  (Id. at 48.)

26      Westra recalled the testimony because of his concern that
27  the examination of the expert proceed properly.  (Id.)  Westra
28  recalled Quick's argument, during which Quick did not appear to

25

be fatigued; Westra recalled nothing about the way Quick
presented himself or discussed the case that caused Westra to
believe that Quick was fatigued to the point of not being able to
continue.  (Id. at 42.)  He did not observe Quick drifting off or
appearing to be falling asleep, despite Westra's general effort
to make sure during trials that everyone in the courtroom,
including counsel, was awake.  If Westra observed someone
starting to fall asleep during a trial, his practice was not to
call attention to his observation, but to state to the jury that
it was appropriate to take a recess, and he would then recess the
proceedings and investigate the problem.  He did not do that in
Petitioner's case.  He would take the same action if he felt that
an attorney was under stress in closing argument, but he did not
do so in Petitioner's case.  (Id. at 43-44.)

On cross-examination, Westra recalled that there were
objections to the gang expert's qualifications but not
necessarily to his opinions.  (Id. at 44-45.)

The redacted declaration of Garrett Hamilton (Jt. Ex. 1),
the prosecutor at trial, was admitted into evidence for all
purposes. (RTEH 2-3.)  Hamilton declared that he generally
recalled Petitioner's case and the participants in the trial, and
he had reviewed portions of the trial transcript.  Hamilton did
not remember seeing Mr. Quick asleep or being fatigued during
closing argument.  After reviewing Mr. Quick's objection and
statement about not hearing testimony and perhaps having been
asleep, Hamilton did not remember being there and hearing the
statement.  (Doc. 83, 4.)  In the "several if not numerous cases"
Hamilton had with Mr. Quick when Hamilton was in the Kern County

District Attorney's Office, Quick had been an experienced and capable opponent in criminal matters.  (Id.)

Respondent's counsel represented that he had interviewed but decided not to call additional witnesses who had no pertinent recollection regarding counsel's sleeping, including the Superior Court clerk and reporter, and the gang expert witness, Officer Gonzales.  (RTEH 8-9.)  Petitioner's counsel likewise stated that she did not intend to call any other witnesses.  (RTEH 9.)

II. Legal Standards

A.  Relief pursuant to 28 U.S.C. § 2254

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies to the petition.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption

1   or correctness by clear and convincing evidence.

2       The petitioner bears the burden of establishing that the

3   decision of the state court was contrary to, or involved an

4   unreasonable application of, the precedents of the United States

5   Supreme Court.  Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th

6   Cir. 2004); Baylor v.Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).

7       A state court's decision contravenes clearly established

8   Supreme Court precedent if it reaches a legal conclusion opposite

9   to the Supreme Court's or concludes differently on an

10  indistinguishable set of facts.  Williams v. Taylor, 529 U.S.

11  362, 405-06 (2000).  The state court need not have cited Supreme

12  Court precedent or have been aware of it, "so long as neither the

13  reasoning nor the result of the state-court decision contradicts

14  [it]."  Early v. Packer, 537 U.S. 3, 8 (2002).  The state court

15  unreasonably applies clearly established federal law if it either

16  1) correctly identifies the governing rule but then applies it to

17  a new set of facts in a way that is objectively unreasonable, or

18  2) extends or fails to extend a clearly established legal

19  principle to a new context in a way that is objectively

20  unreasonable.  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir.

21  2002); see, Williams, 529 U.S. at 408-09.  An application of law

22  is unreasonable if it is objectively unreasonable; an incorrect

23  or inaccurate application of federal law is not necessarily

24  unreasonable.  Williams, 529 U.S. at 410.

25          B.   Ineffective Assistance of Counsel

26              1.  General Standards

27       The law governing claims concerning ineffective assistance

28  of counsel is generally clearly established for the purposes of

28

1   the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

2   Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

3          To demonstrate ineffective assistance of counsel in

4   violation of the Sixth and Fourteenth Amendments, a convicted

5   defendant must show that 1) counsel's representation fell below

6   an objective standard of reasonableness under prevailing

7   professional norms in light of all the circumstances of the

8   particular case; and 2) unless prejudice is presumed, it is

9   reasonably probable that, but for counsel's errors, the result of

10  the proceeding would have been different.  Strickland v.

11  Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d

12  344, 346 (9th Cir. 1994).  A petitioner must identify the acts or

13  omissions of counsel that are alleged to have been deficient.

14  Strickland, 466 U.S. 690.  This standard is the same standard

15  that is applied on direct appeal and in a motion for a new trial.

16  Strickland, 466 U.S. 697-98.

17         In determining whether counsel's conduct was deficient, a

18  court should consider the overall performance of counsel from the

19  perspective of counsel at the time of the representation.

20  Strickland, 466 U.S. at 689.  There is a strong presumption that

21  counsel's conduct was adequate and within the exercise of

22  reasonable professional judgment and the wide range of reasonable

23  professional assistance.  Strickland, 466 U.S. at 688-90.

24         In determining prejudice, a reasonable probability is a

25  probability sufficient to undermine confidence in the outcome of

26  the proceeding.  Strickland, 466 U.S. at 694.  In the context of

27  a trial, the question is thus whether there is a reasonable

28  probability that, absent the errors, the fact finder would have

29

1   had a reasonable doubt respecting guilt. <u>Strickland</u>, 466 U.S. at

2   695.  This Court must consider the totality of the evidence

3   before the fact finder and determine whether the substandard

4   representation rendered the proceeding fundamentally unfair or

5   the results thereof unreliable.  <u>Strickland</u>, 466 U.S. at 687,

6   696.

7        A court need not address the deficiency and prejudice

8   inquiries in any given order and need not address both components

9   if the petitioner makes an insufficient showing on one.

10  <u>Strickland</u>, 466 U.S. at 697.

11              2.  <u>Counsel's Sleeping</u>

12       It has been held that when an attorney for a criminal

13  defendant slept through a substantial portion of a trial when

14  evidence against the defendant was being heard, the conduct was

15  inherently prejudicial, and thus no separate showing of prejudice

16  was necessary.  <u>Javor v. United States</u>, 724 F.2d 831, 833-34 (9th

17  Cir. 1984) (citing <u>Holloway v. Arkansas</u>, 435 U.S. 475, 489-91

18  (1978) [holding that improperly requiring joint representation of

19  co-defendants by counsel with potential conflicts of interest

20  demanded automatic reversal based on prejudice being presumed]

21  and <u>Rinker v. County of Napa</u>, 724 F.2d 1352, 1354 (9th Cir.

22  1983)).  Prejudice is inherent in such circumstances because an

23  unconscious or sleeping attorney is equivalent to no counsel at

24  all due to the inability to consult with the attorney, receive

25  informed guidance during the course of the trial, or permit

26  testing of credibility of witnesses on cross-examination.  <u>Id.</u> at

27  834 (citing <u>Geders v. United States</u>, 425 U.S. 80, 88 (1976)

28  [regarding sequestration of the defendant from his counsel during

                                30

trial between his direct and cross-examination]).  The harm is in what the attorney does not do, and such harm is either not readily apparent on the record, or occurs at a time when no record is made.  <u>Javor</u> at 834.

The court in <u>Javor</u> distinguished cases involving specific acts or particularized instances of misconduct of counsel from cases where there is an absence of counsel; the latter cannot be evaluated under the normal standards.  <u>Id.</u> at 835.

It has been held that where an attorney has not been sleeping or dozing during a substantial portion of the trial and may not have been sleeping at all, <u>Javor</u> is inapposite, and the petitioner has burden of showing prejudice.  <u>U.S. v. Petersen</u>, 777 F.2d 482, 484 (9th Cir. 1985).

Similarly, in a recent case in this district, the Court held that a state prison inmate was not entitled to habeas relief where the inmate failed to meet his burden to establish that 1) his trial counsel slept through a substantial portion of the trial or 2) he was prejudiced by defense counsel's allegedly deficient conduct (consisting of counsel's appearance of sleepiness and admitted tiredness at the penalty phase of the trial, as well as about a dozen specific omissions) or that the result of the proceedings would have been different had counsel made specific objections to the prosecutor's argument.  <u>Berryman v. Wong</u>, No. 1:95-cv-05309-AWI, 2010 WL 289181 (E.D. Cal, Jan. 15, 2010).  The Court determined that the only factual issue was whether counsel was asleep through a substantial portion of the trial, and if so, such conduct was inherently prejudicial; if not, the case presented a standard ineffective assistance claim

31

1  under <u>Strickland</u>.  The Court stated that <u>Javor</u> was the
2  controlling authority that established that sleeping during a
3  substantial portion of the trial was tantamount to structural
4  error under <u>Arizona v. Fulminante</u>, 499 U.S. 379, 407 (1991).

5      However, in <u>Berryman</u>, it was held that where counsel denied
6  having slept during the proceedings, counsel's having been
7  observed as fleetingly inattentive or having closed his eyes
8  three to five times during a trial enduring over a month, did not
9  meet the "substantial portion" threshold, and thus the presumed
10 prejudice standard did not apply.  Additional analysis reflected
11 that Petitioner did not establish actual prejudice with respect
12 to about a dozen specific omissions of counsel.  <u>Berryman v.
13 Wong</u>, 2010 WL 289181, *5-*9.

14     Here, the additional, allegedly ineffective omissions of
15 counsel that were previously before this Court and the Ninth
16 Circuit were not the subject of the remand; only the sleeping
17 issue was remanded.

18     III.  <u>Analysis</u>

19          A.  <u>Clearly Established Federal Law</u>

20     Respondent argues that there is no clearly established
21 federal law concerning a test for the ineffective assistance of
22 counsel that governs a case such as the present in which it is
23 alleged generally that counsel has slept through substantial or
24 critical portions of the trial proceedings.  Respondent points to
25 the absence of any Supreme Court decision in such a case.

26     In considering the present petition, this Court must first
27 decide what constitutes "clearly established Federal law, as
28 determined by the Supreme Court of the United States" within the

1   meaning of § 2254(d)(1).  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71

2   (2003).  The term refers to the holdings, as distinct from dicta,

3   of decisions of the Supreme Court as of the time of the relevant

4   state court's decision.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412

5   (2000).  It is thus the governing legal principle or principles

6   set forth by the Supreme Court at the time of the state court

7   decision.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72.

8       A Supreme Court case must squarely address an issue, its

9   cases must provide a categorical or clear answer to the question,

10  or its cases must clearly extend to the factual context in

11  question; if a principle must be modified in order to be applied

12  to a case, it is not clearly established federal law for the

13  purpose of that case.  <u>Wright v. Van Patten</u>, 552 U.S. 120, 124-26

14  (2008); <u>Carey v. Musladin</u>, 549 U.S. 70, 76-77 (2006); <u>Moses v.</u>

15  <u>Payne</u>, 555 F.3d 742, 752, 754 (9th Cir. 2009).

16      In <u>Moses</u>, the court noted that a state court must apply

17  legal principles established by a Supreme Court decision when a

18  case falls squarely within those principles, but not in cases

19  where there is a structural difference between the prior

20  precedent and the case at issue, or when the prior precedent

21  requires tailoring or modification to apply to the new situation.

22  <u>Moses</u>, 555 F.3d at 753.  The Court concluded that the Supreme

23  Court cases concerning clearly established federal law emphasize

24  that § 2254(d)(1) "tightly circumscribes" the granting of habeas

25  relief.  <u>Id.</u> at 753-54.

26      Here, in <u>Javor</u>, the Court of Appeals for the Ninth Circuit

27  determined the applicability of the principle of attributing

28  inherent prejudice to the absence of counsel to a factual

situation involving counsel's sleeping during critical or substantial stages of trial at which there is a right to counsel. Javor v. United States, 724 F.2d 831, 833-34 (9th Cir. 1984) (citing Holloway v. Arkansas, 435 U.S. 475, 489-91 (1978) [holding that improperly requiring joint representation of co-defendants by counsel with potential conflicts of interest demanded automatic reversal based on prejudice being presumed]).

Although only Supreme Court holdings qualify under § 2254(d)(1), circuit court precedent may be persuasive in demonstrating what law is clearly established and whether a state court applied that law unreasonably.  Maxwell v. Roe, 628 F.3d 486, 494-95 (9th Cir. 2010).  The court in Javor extracted the principle of inherent prejudice from Supreme Court cases concerning the absence of effective counsel and applied it to a situation involving an unconscious attorney.  The court reasoned that an unconscious or sleeping attorney during substantial trial proceedings is equivalent to no counsel at all due to the inability to consult with the attorney, receive informed guidance during the course of the trial, or permit testing of credibility of witnesses on cross-examination. Javor v. United States, 724 F.2d at 834.

This reasoning is consistent with a line of Supreme Court cases which applies a presumption of inherent prejudice to cases involving significant absence of counsel in place of Strickland's analysis of prejudice resulting from specific omissions of counsel.  The Supreme Court has indicated that the presumption of prejudice set forth in United States v. Cronic, 466 U.S. 648 (1984) applies when the likelihood that any lawyer,

1   even a fully competent one, could provide effective assistance is

2   so small that a presumption of prejudice is appropriate without

3   inquiry into the actual conduct of the trial, including

4   situations involving the complete denial of counsel, such as

5   where counsel is totally absent, prevented from assisting the

6   accused during a critical stage of the proceeding, or where

7   counsel entirely and completely fails to subject the prosecutor's

8   case to meaningful adversarial testing.  Wright v. Van Patten,

9   552 U.S. 120, 124 (2008) (citing Cronic, 466 U.S. at 658-60).

10      In Wright v. Van Patten, the Court determined that despite

11  decisions concerning the complete absence of counsel at the time

12  a defendant enters his plea, there was no decision squarely

13  addressing the issue of whether counsel's presence via speaker

14  phone should be treated as a complete denial of counsel and thus

15  be tested pursuant to Cronic instead of Strickland.  Wright, 552

16  U.S. at 125.  The Court concluded that its own cases neither

17  provided a categorical answer to the question nor pointed toward

18  one, and thus the state court's decision could not be said to be

19  an unreasonable application of clearly established federal law.

20  Id. at 125-26.

21      Here, the phenomenon of counsel sleeping during critical or

22  substantial trial proceedings falls squarely within the

23  parameters of the Cronic principle because regardless of an

24  attorney's technical presence at the site of a trial and

25  potential competence if conscious, an unconscious attorney

26  logically cannot provide effective assistance and necessarily

27  fails entirely and completely to submit the prosecutor's case to

28  meaningful adversarial testing during the period of

1  unconsciousness.

2      A case need not be factually identical to one decided by the
3  Supreme Court in order for the law to be clearly established.
4  Pannetti v. Quarterman, 551 U.S. 930, 948-53 (2007) (applying a
5  procedural principle requiring a prisoner seeking a stay of an
6  execution who has made a substantial threshold showing of
7  insanity to have a fair hearing to a death row prisoner
8  challenging his execution on the grounds of mental incompetence).

9      In Carey v. Musladin, 549 U.S. 70, 72-77 (2006), the Court
10 held that a state court decision that a defendant was not
11 inherently prejudiced when spectators at his trial wore buttons
12 depicting the murder victim was not contrary to or an
13 unreasonable application of clearly established federal law in
14 the absence of a United States Supreme Court precedent as to the
15 potentially prejudicial effect of spectators' courtroom conduct
16 on fair trial rights, and thus a grant of habeas relief was
17 incorrect.  Although the Court had issued decisions concerning
18 prejudice from the conduct of government agents or employees at
19 trial, it concluded that the effect on a defendant's fair-trial
20 rights of spectator conduct was an open question in the
21 jurisprudence of the Court because the Court had never addressed
22 a claim that such conduct by a private actor was so inherently
23 prejudicial that it deprived a defendant of a fair trial.  Id. at
24 76.  Thus, because there was no holding of the Court requiring
25 the state court to apply any particular test, it could not be
26 said that the state court unreasonably applied clearly
27 established federal law.  Id. at 77.

28      Unlike the situation in Carey v. Musladin, the present case

36

does not involve factual differences that raise distinct policy issues or require any modification of the governing principle.

In Javor, the Court applied the presumption of inherent prejudice to a situation in which counsel slept during substantial portions of trial proceedings at which the accused had a right to the assistance of counsel.  The decision rested on clearly established standards set forth in Strickland and Cronic. The Court concludes that Javor embodies legal principles that were clearly established federal law within the meaning of § 2254(d)(1) at the time of the pertinent state court proceedings.

If this conclusion is erroneous, and if there was no clearly established federal law concerning counsel's sleeping during substantial trial proceedings, then the state court's decision was not contrary to or an unreasonable application of clearly established federal law under § 2254(d)(1).  Carey v. Musladin, 549 U.S. 70, 77 (2006).

B.  Extent of Counsel's Sleeping

The Court of Appeals cited Strickland and Cronic and remanded the case for this Court to hold an evidentiary hearing to determine whether Petitioner's counsel slept during the trial, how long he slept, and through what portions of the trial.  The court declined to engage in speculation "to answer a serious question about an important constitutional right."  The court expressly concluded that Petitioner's claim could not be resolved by reference to the state court record in this case, citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007).  In the cited portion of Schriro v. Landrigan, the Court instructed that in

1  deciding whether an evidentiary hearing is appropriate, a court

2  must consider whether the state court record resolves the issues.

3       The parties disagree regarding the degree of deference to be

4  accorded to the state court decision concerning Petitioner's

5  claim.  Uncertainty and diverging views on this subject have been

6  acknowledged by the Supreme Court.  See, Holland v. Jackson, 542

7  U.S. 649, 653 (2004).

8       The state trial court concluded that in his first petition,

9  Petitioner had failed to state sufficient facts to show that he

10 had been prejudiced because he had failed to submit facts or

11 documentary evidence concerning the specifics of counsel's

12 sleeping and its effect on his rights.  (Ans., Ex. K, 2.)  The

13 state trial court denied the second petition after Petitioner

14 alleged sleeping through portions of the examination of an

15 adverse witness and having missed a question and answer posed to

16 the witness because, in part, Petitioner had failed to state a

17 prima facie case for relief.  (Ans., Ex. M.)  The state appellate

18 court and highest state courts summarily denied relief based on

19 essentially the same facts plus Petitioner's declaration under

20 penalty of perjury regarding his personal observations and one

21 page of transcript.  (Ans., Ex. N, Ex. A; Exs. O-Q.)

22      Petitioner prayed for evidentiary hearings in his state

23 court petitions (Ans., Exs. J, L, N, P), but it does not appear

24 that Petitioner received an evidentiary hearing.  Because the

25 state courts refused Petitioner an evidentiary hearing, no

26 deference to state court fact findings is implicated or required.

27 Nunes v. Mueller, 350 F.3d 1045 (9th Cir. 2003); Killian v.

28 Poole, 282 F.3d 1204, 1208 (9th Cir. 2002).

Further, in light of the Ninth Circuit's finding that the state court record was inadequate to determine the remaining issue in this case, this Court will proceed to consider the evidentiary development in the proceedings held in this Court as mandated by the Court of Appeals.[3]

If believed, Petitioner's evidence would establish at most that his trial counsel fell asleep momentarily for one instance during the examination of the gang expert, then awoke, and then lodged an objection and proceeded with the trial.

However, the Court finds that Petitioner's testimony concerning having observed this alleged instance of unconsciousness was not credible.

The Court's finding is based in part on the Court's observation of Petitioner during his testimony, including his demeanor and the substance of his testimony.

Petitioner, who is serving a lengthy sentence for conviction of an offense which the evidence strongly supported, is highly motivated to represent the events in a way that would warrant a reversal of his conviction without the necessity of any consideration of prejudice.

---

[3] "The law of the case doctrine is a judicial invention designed to aid in the efficient operation of court affairs." Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir.1990). Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court    in the identical case. See id. A trial judge's decision to apply the doctrine is thus reviewed for an abuse of discretion. See Milgard Tempering, 902 F.2d at 715.
United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000). A court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. United States v. Lummi Indian Tribe, 235 F.3d at 452-53 (citing United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998)).

1    Petitioner's failure to complain in the trial court
2  concerning counsel's alleged sleeping was starkly inconsistent
3  with his repeated motions in the trial court to have his
4  appointed counsel's appointment terminated.  Although Petitioner
5  may have had some uncertainty concerning the precise extent of
6  his trial rights, it is not reasonable to conclude that he would
7  not have understood that counsel's sleeping during the trial was
8  an appropriate subject of a complaint at that level.

9    Petitioner's testimony is inconsistent with the other
10 evidence adduced at the evidentiary hearing.  The Court credits
11 the testimony of Judge Westra and Mr. Quick, who testified
12 carefully after having taken the time to review the record.
13 Trial counsel expressly and clearly testified that his statement
14 was a joke predicated on his belief that the record did not
15 reflect the evidence as stated by the prosecutor in a question;
16 counsel was being sarcastic.  Counsel denied sleeping at the
17 trial.  Further, he even denied having suffered fatigue to the
18 extent that it affected the competence of his performance.

19   Neither the trial judge nor the prosecutor recalled Quick's
20 having slept.  In light of the trial judge's custom of policing
21 the attentiveness of the trial participants, the judge's failure
22 to undertake any measures to maintain counsel's attention
23 strongly supports a finding that counsel was not inattentive or
24 sleeping during the trial.

25   Petitioner's testimony was inconsistent with the state court
26 record.  As the detailed statement of the trial proceedings set
27 forth above demonstrates, Petitioner's counsel actively
28 participated in the trial by planning for the upcoming stages of

40

1   the trial, examining and cross-examining witnesses, objecting to
2   evidence, requesting instructions, and engaging in argument.  The
3   Court finds that the transcripts reflect an attentive and
4   participatory counsel without any indication of any significant
5   or substantial lapse in counsel's attention or participation.

6        The Court has considered the fatigue of Petitioner's counsel
7   only in relation to Petitioner's claim concerning counsel's
8   sleeping during trial.  The Court concludes that the evidence of
9   counsel's fatigue at the end of the trial week does not tend to
10  show that counsel slept during the trial.

11       Because no deference to state court factual findings is due
12  here, the Court considers whether Petitioner has met his burden
13  to establish a right to relief by a preponderance of the
14  evidence.  After considering all the evidence, the Court finds
15  that Petitioner's counsel did not sleep at all during the trial.

16       Because this Court has found that counsel did not sleep
17  during the trial at all, the <u>Cronic</u> rule of inherent prejudice is
18  not applicable to Petitioner's claim concerning the ineffective
19  assistance of trial counsel.

20       Further, in view of this Court's finding that counsel did
21  not sleep, application of the <u>Strickland</u> standard results in a
22  conclusion that Petitioner has not demonstrated that his
23  counsel's representation fell below an objective standard of
24  reasonableness under prevailing professional norms in light of
25  all the circumstances of this case.  It is thus unnecessary for
26  this Court to address the prejudice prong of the <u>Strickland</u>
27  analysis.

28       Because the sole claim before this Court upon remand from

41

1   the Ninth Circuit Court of Appeals is Petitioner's claim

2   concerning counsel's sleeping, the Court concludes that

3   Petitioner has failed to show that he is entitled to relief

4   pursuant to 28 U.S.C. § 2254.

5       Accordingly, it will be recommended that the first amended

6   petition for writ of habeas corpus be denied.

7       IV.  <u>Certificate of Appealability</u>

8       Unless a circuit justice or judge issues a certificate of

9   appealability, an appeal may not be taken to the Court of Appeals

10  from the final order in a habeas proceeding in which the

11  detention complained of arises out of process issued by a state

12  court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537

13  U.S. 322, 336 (2003).  A certificate of appealability may issue

14  only if the applicant makes a substantial showing of the denial

15  of a constitutional right.  § 2253(c)(2).  Under this standard, a

16  petitioner must show that reasonable jurists could debate whether

17  the petition should have been resolved in a different manner or

18  that the issues presented were adequate to deserve encouragement

19  to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336

20  (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A

21  certificate should issue if the Petitioner shows that jurists of

22  reason would find it debatable whether the petition states a

23  valid claim of the denial of a constitutional right and that

24  jurists of reason would find it debatable whether the district

25  court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>,

26  529 U.S. 473, 483-84 (2000).

27      In determining this issue, a court conducts an overview of

28  the claims in the habeas petition, generally assesses their

42

merits, and determines whether the resolution was debatable among
jurists of reason or wrong.  Id.  It is necessary for an
applicant to show more than an absence of frivolity or the
existence of mere good faith; however, it is not necessary for an
applicant to show that the appeal will succeed.  Miller-El v.
Cockrell, 537 U.S. at 338.

A district court must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

Here, it does not appear that reasonable jurists could
debate whether the petition should have been resolved in a
different manner.  Petitioner has not made a substantial showing
of the denial of a constitutional right.  Accordingly, it will be
recommended that the Court decline to issue a certificate of
appealability.

V.  Recommendation

It is RECOMMENDED that:

1)  The petition for writ of habeas corpus be DENIED; and

2)  Judgment be ENTERED for Respondent; and

3)  The Court DECLINE to issue a certificate of
appealability.

These findings and recommendations are submitted to the
United States District Court Judge assigned to the case, pursuant
to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of
the Local Rules of Practice for the United States District Court,
Eastern District of California.  Within thirty (30) days after
being served with a copy, any party may file written objections
with the Court and serve a copy on all parties.  Such a document

43

1  should be captioned "Objections to Magistrate Judge's Findings

2  and Recommendations."   Replies to the objections shall be served

3  and filed within fourteen (14) days (plus three (3) days if

4  served by mail) after service of the objections.   The Court will

5  then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

6  636 (b)(1)(C).   The parties are advised that failure to file

7  objections within the specified time may waive the right to

8  appeal the District Court's order.   <u>Martinez v. Ylst</u>, 951 F.2d

9  1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    March 28, 2011**                        _____/s/ Sandra M. Snyder_____
                                                    UNITED STATES MAGISTRATE JUDGE